We will hear the next case, Kainz v. Bernstein. Good morning, may it please the court. My name is Michael Malone and I'm arguing on behalf of Plaintiff Appellate Roman Kainz today. Your Honor, the District Court's decision dismissing Mr. Kainz's fraud and inducement claim should be reversed because Mr. Kainz has stated a valid cause of fraud. Mr. Kainz's 2016 email represented that Mr. Kainz would only receive shares in new express BA if he signed a joint agreement. This is contrary to the express language of Article 8 of the operating agreement of original express BA and it has existed at that moment in time. These facts are sufficient to establish an actual misrepresentation by Mr. Bernstein. Mr. Kainz has alleged actual reliance in that Mr. Bernstein's representation was a substantial factor in causing Mr. Kainz to execute the joinder agreement at issue in this case. Mr. Kainz has alleged in his pleading a months-long campaign by Mr. Bernstein and Mr. Phoenix to coerce Mr. Kainz to sign the joinder agreement. The proximity in time between Mr. Bernstein's representation and the date on which Mr. Kainz signed the joinder agreement establishes actual reliance here. Moreover, Mr. Kainz has alleged facts sufficient to satisfy the requirement of reasonable reliance. This is not a case where an investor failed to take advantage of an opportunity to conduct due diligence. Mr. Kainz knew of and participated in an effort by other minority investors to conduct due diligence on this transaction. He asked Mr. Bernstein for information regarding the transaction. These facts are sufficient to show that he acted reasonably in relying on Mr. Bernstein's statement. It is also important here that Mr. Bernstein spoke from a position of superior knowledge and power. Mr. Bernstein served as a director of both the original company and the post-merger company. He negotiated the transaction. He had far superior knowledge about the details than Mr. Kainz did. Counsel, I have a couple of questions. My first question is, but what are the damages? If your client had not signed up and joined, the stock that he would have gotten, he would have been put in estro. Now you say that the estro would be less strict, but you don't tie that in any way to the damages you say occurred, which was because you weren't able to sell the stock. Whether the estro was as strict or not, there's no indication that you would have been able to sell the stock. My second question goes to whether you couldn't find that out, the out that you could have gotten the stock anyway without signing. The agreement was perfectly clear and even if it wasn't given to you, it wasn't that difficult for you to get it. So yes, you relied, but did you do what you needed to to avoid the problem? Those are my two questions. Thank you. Thank you, Your Honor. To address your first question, I submit that it is not accurate to say that the shares would have been placed in the same escrow arrangement provided for in the merger agreement and joinder agreement. And that is because until Mr. Kainz signed the joinder agreement, he was not obligated by any of the terms of the merger agreement. He was bound only by the obligations placed upon him in the operating agreement as it existed at that time. And the for an escrow arrangement similar to what was in the merger agreement. This case is similar to a V-LACE versus S&P Global Incorporated. In a V-LACE, an investor relied on a misrepresentation by S&P as to the liquidity of a particular investment. After the investment was made, the investor found that the securities were completely illiquid and the district court found loss causation based on the illiquidity of the investment here. That's what happened with Mr. Kainz. Mr. Kainz was falsely induced to place his shares in escrow for a period of at least 18 months during which he would have no right to sell any of the shares. He would have no rights whatsoever with respect to his shares. That is the very definition of illiquidity. In the escrow provision provided for in the operating agreement, all that is required is that the shares in the newly merged company would be placed in escrow until the transfer to the holder is finalized. That contemplates a very short period of time after which the holder would be free and clear to sell the shares at his or her pleasure. There's a fundamental difference in liquidity of Mr. Kainz's holdings as a result of his execution of the joinder agreement in reliance upon the misrepresentation by Mr. Bernstein. Can I ask you a question about reliance? This is Jeff Sullivan. Section 13 of the person signing has reviewed all the documents relevant to the transaction. It also indicates that he obtained the advice of his own legal counsel with respect to the joinder, the other transaction documents, and the transactions contemplated herein. Obviously, it sounds like your client didn't do that, but by representing that he had done that, how can he claim that he reasonably relied on the allegedly false statements? Thank you, Your Honor. I'll try to also answer the prior question as well in the context of this one. Both questions go to reasonable reliance. Plaintiff submits that the facts alleged in the pleadings established reasonable reliance. Mr. Kainz did not retain individual counsel for himself. However, he did participate in a group of minority investors who did retain counsel to obtain advice about the documents. And then there are established case precedents here showing that a general disclaimer is not enforceable against a specific representation. And I'm referring to Cayola versus Citibank cited in our papers. The disclaimers in the documents here are general boilerplate disclaimers. The court must consider the entire context of the transaction when evaluating reasonable reliance. And that context involves massively complex transaction documents and running out of the clock by Mr. Bernstein. Mr. Bernstein made his representation at a time when he knew that Mr. Kainz's time to exercise his peremptory rights was expiring. And he used that to advantage to induce Mr. Kainz into signing the joinder agreement. We submit that the facts alleged in the pleadings established that Mr. Kainz acted reasonably under the circumstances. This is Judge Katzman. My question, which is built upon some of the previous questions and is that you say that, as I understand it, and correct me if I'm misunderstanding, that the district court, and I quote, misapprehended it, the word you use, your theory of damages, because the real damages stem from the escrow and release provision in the joinder agreement. But your motion to dismiss opposition brief has really only a handful of references to the escrow provisions, all of them in the context of Seantor, and one passing reference to legal releases. How could the, this is my question, how could the district court have misrepresented an argument that arguably was never made? Well, Your Honor, we do submit that the argument was made. You know, I would have to review in more detail the specific portions of the brief that you're looking at, but we do submit that the argument was made of loss causation here regarding the illiquidity resulting from the escrow arrangement. The facts regarding the damages resulting from the escrow arrangement were also included in the pleadings. I think this is also relevant to our motion under Rule 59 and Rule 60, and for leave to amend following the court's decision on the motion to dismiss. On the leave to amend argument, if, for the sake of argument, we were to conclude that the original argument, that the original complaint and the proposed amended complaint do not adequately allege falsity, how would you cure such a deficiency in an amended complaint? Adequately allege falsity of the representation? Yeah. Well, Your Honor, I would. What would you do? Additional facts. The court, I'm sorry, Your Honor, are you finished? Yes. I mean, you asked, you wanted to, you filed a motion for leave to amend, and my question is, what would you provide in that leave to amend? With respect to the falsity of the representation, Your Honor, we would allege facts regarding the terms of Article 8 of the operating agreement as compared to the escrow and other provisions of the merger agreement and joinder agreement. In our view, they directly conflict. Section 804 of the operating agreement expressly says that no holder shall be obligated to sign an agreement placing liabilities on them for representations unless all holders are required to sign the merger agreement. I think it's Section 6M states that only 95 percent of holders are required to sign the merger agreement for the merger to proceed, and that's really where the rubber meets the road. Mr. Keynes was not required to sign a joinder. He could not have prevented the merger from proceeding because he held less than 5 percent, and had he not signed the joinder, he would have received his shares within a month or two of the closing of the merger, free and clear of the escrow arrangement. Mr. Bernstein, as I mentioned earlier, served as a director of both companies. While the negotiations were proceeding, he was sitting at both sides of the table. He was intimately involved in all aspects of the negotiation. He had a large financial stake in the outcome of this merger. He had a motive and opportunity to make this happen. He had a motive and opportunity to make sure that minority shareholders' shares were locked up. This is Judge Sullivan. The LLC agreement, operating agreement, expressly disclaims fiduciary duties owed towards unit holders, right? The operating agreement does include a disclaimer of fiduciary duties. It's fairly well recognized in Second Circuit precedent that disclaimers are not effective as to the duty of loyalty. Well, is it New York Second Circuit law or Delaware law that applies to a Delaware LLC? You're correct, Your Honor. It is Delaware law, but Second Circuit cases have recognized Delaware precedent holding that disclaimers of fiduciary duties are not effective as to the duty of loyalty. I think also Bernstein's relative position of superior power and knowledge is relevant to the analysis here of reasonable reliance. Mr. Keynes didn't sign the operating agreement. Bernstein and other directors and large holders have the right to modify the operating agreement without notice to Mr. Keynes. Mr. Keynes would have had to go on to Mr. Bernstein to obtain a copy of this agreement and evaluate it. That is a very definition of superior knowledge and power. Your Honors, I believe my time may be up. Yes, you'll have three minutes. Okay. Thank you. Thank you, Your Honors. Good morning, Your Honor. Sorry, I'm apologizing. Good morning, Your Honor. Francis, may it please the court, Francis Early from Mintz Levin, to the appellees, Mr. Bernstein and Mr. Phoenix. To begin, Your Honor, I think the first question that was asked of counsel gets right to the crux of the matter. The question here is not reliance, it's justifiable reliance. New York law is clear that when a plaintiff has means available to him or her, and they would exercise just ordinary intelligence, that they could ascertain the on a statement made. The case we cite in our brief, Briani case, I think is perfect. It's a good analogy, a very simple analogy. In that case, it was a situation where someone was buying a parking lot, and the plaintiff alleged that the disclosure information didn't give the proper number of parking spaces. When there were multiple times available for the plaintiff to go visit, in fact, they were invited to visit where they could count those parking spaces themselves and see for themselves to confirm that, and for future documentation, corrected that statement. Here, we have a merger agreement that is very clear that only 95% of the shareholders had a sign, the jointer agreement. Mr. Keynes held less than 5%, therefore, he was not required. It was easy for him to determine that. Even more so, Your Honor, the Form S-4 and S-4A that were in the merger agreement, and explicitly set forth that, again, only 95% of the shareholders, excuse me, of the members of Legacy Express Fraud had assigned the jointer agreement for the deal to go forward. Third, as Judge Stanton pointed out very clearly in his decision, the timing here doesn't work. The email at issue that's allegedly a misrepresentation occurred on December 27th. Mr. Keynes signed sometime... Counsel, counsel, if I may, you're making the argument primarily that he ought not to have relied on the misrepresentation. Are you conceiving that your client misrepresented? No, I'm not. Well, you sounded very much like it. So, I want to know, in what way would you be arguing that there was no misrepresentation, rather than simply that this person was a grown-up and should have seen proof of misrepresentation and not have been misled? I would say, initially, Your Honor, if you read, and I think counsel misconstrued the documents, the language of the merger transaction is very clear. There's a percentage of everyone's shares, and there's a formula set aside for everyone who was in every member of Legacy Express Fraud that was going to be set in escrow. The second part was, if you wanted to receive the second half of the shares, which are defined as acquisition shares, at the time of the transaction closing, you had to sign the joinder agreement. So, if you signed the joinder agreement, you would get your shares immediately. If you didn't, then that percentage of shares would then be put in with their other escrow shares and be subject to the terms of the escrow agreement. So, by signing the escrow agreement, Mr. Keynes, excuse me, by signing the joinder agreement, Mr. Keynes got access to the percentage of shares and he was able to sell those. If he didn't sign, he wouldn't have been able to get those. So, what Mr. Bernstein said wasn't a misrepresentation. It was accurate based on the terms of the document. Thank you. Sure. Moving forward, as I said, the information was available publicly. The timing, even if Mr. Keynes were to rely on the alleged misstatement as we dispute, if he signed the joinder before the merger and before the email, clearly he didn't rely upon it. If he signed after the merger, then clearly the shares would have been converted already and it would have been too late. I think counsel's mistaken in making the statement that if he didn't sign the joinder agreement, he would have had the shares. If he didn't sign the joinder agreement, the transaction still would have gone forward. And if he was upset with the transaction, in Delaware, you have the center's rights. Not like he would have legacy ExpressBot shares cease to exist. Whether Mr. Keynes signed the joinder agreement or not, those shares on So there's no, by not signing the joinder, there was no advantage. The only advantage was signing the joint agreement to get access to your shares. So you would have liquidity. Moving on your honor to damages. I think that was another question that was raised. I think I just addressed that in the sense that if you have the shares, if you have access to the shares immediately by signing the joinder, how could you have damages? It just doesn't make any sense. There's no connection. Can I ask you a question about the leave to amend? Sure. Let's assume that we think that you're correct, that there was no false statement. Why shouldn't we allow Mr. Keynes at least one opportunity to replete? I mean, isn't it conceivable that Bernstein's email misstated or oversimplified thing about this complicated transaction and corporate structure and that Mr. Keynes could plausibly state that the claim in an alleged complaint? Your honor, I think there's two reasons why I would say it doesn't, it wouldn't make sense to allow motion to amend. One, there's nothing new. Every fact about this has been out there for three years. In fact, counsel has had two cases dismissed related to the very same deal for different parties that are largely the same allegations. One was in front of the second circuit just a few months ago and was affirmed. Judge Stanton dismissed it and there's another case recently dismissed. There's nothing new. These facts have been known to everybody for three years. There's nothing new to discover. Secondly, I would add, counsel and plaintiff waited until post-judgment. If this were pre-judgment, right, there are standards that should be freely granted. But once there's post-judgment, I mean, it has to be some finality. They have the right to move, remove, to vacate, and reconsider, which as your honors know, they did. And that was denied by Judge Stanton as well. The reconsideration was denied and the vacate was denied because there's no new facts. There was no new issue of law. There was nothing to reconsider. I would finally add that they attached a draft amended complaint. The draft amended complaint doesn't address the deficiencies here. It's futile. In fact, the allegations relating to the alleged misrepresentation are exactly the same. They put in allegations relating to claims that were released and dismissed. And counsel has actually dismissed those claims in this case. They stipulated to dismiss those cases. And as, I'm sorry, I don't know which judge referenced earlier, the operating agreement. The operating agreement clearly states that it's LLC, not corporate law. Delaware corporate law does not permit one to waive the duty of loyalty. However, Delaware LLC law is crystal clear because members of an LLC are members of a contract. It's different. It's not a shareholder relationship. It's different. And in that situation, Delaware law permits an LLC to waive all rights, duty of loyalty, duty of care, duty of candor, everything. So there's nothing to do here. There's nothing to fight about going forward. This should be the end, express pause in dealing with different variations of Mr. Kane's and Mr. Kane's fellow shareholders who were basically just disappointed that they sold the company. That's what this case comes down to. Now, we have the case of Williams versus Citigroup, a 2011 case that says that, and I'm quoting outright refusal to grant leave to a man without any justifying reason, appearing for the denial is not an exercise of discretion. It is merely abuse of that discretion and inconsistent with the spirit of the federal rules. How do you square Williams with this case? I agree that Judge Stanton, if he would have said it was apparent or denied because it was futile, would have made things easier. But if you read his decision on the motion to dismiss the decisions and the motion reconsider together, which they really were, he lays out in his decision on motion to dismiss why it would be futile for any amendment to go forward and why there is a basis for a reconsideration or no basis to vacate. With that, if you read those two decisions together, it is consistent and it makes sense. I agree that if Judge Stanton would have just said it was futile because it's futile or the reconsideration is denied because it was baseless, that would have made things a little easier. But he didn't quite do that. But we have the proposed claim now, right? You're saying there's no need to send it back because we have the universe of relevant facts and pleadings that would support a futility finding. Correct. Yeah, right. I wasn't very clear there. And the Williams court merely remanded for the case to determine whether the amendments were futile. Here we have the amendments in front of us, so it's easy to tell that they're futile. Do you have anything further to say? If there are no further questions, we'll hear rebuttal from your adversary. Just one final point, Your Honor. Mr. Phoenix, there's an aiding and abetting claim against him. Clearly, we believe that the fraudulent inducement claim should fail, so the aiding and abetting claim should fail. We would also add on behalf of Mr. Phoenix, he's not on the alleged email, that's the alleged misrepresentation. There's no statement that he acknowledges any of that. There's all there are conclusively threadbare allegations that there are throughout the entire Mr. Phoenix's relationship or involvement in this. With that, I rest. Thank you. Thank you. Your Honor, Michael Maloney for plaintiff's appellant, Mr. Keynes, responding to a few of defendant's points here. First, with respect to the falsity of the representation. Again, this is established by the documents themselves. Counsel for defendants argues that the terms of the merger agreement provide for the placement of shares into escrow, but Mr. Keynes was not a party to that agreement. The company, up to the moment he signed the joinder agreement, nobody could force him to sign the merger agreement or the joinder agreement. His rights were governed by the operating agreement. It is the act of signing the joinder agreement and the inducement based on a false representation to cause him to sign the joinder agreement that gets to this escrow issue. Counsel cannot rely on the text of the merger agreement when it is the inducement to sign that agreement that is at issue here. Second, to address the question of timing, timing is in some respects irrelevant to the fraudulent inducement claim here. Because Mr. Keynes' rights were fundamentally altered as a result of signing the joinder agreement, it didn't really matter when he signed it. He signed it a few days after the closing, but that would not affect the closing. Mr. Keynes owned approximately 1% of Original Express Vaughn. He never could have stopped this transaction. He could have avoided his shares being placed in this onerous escrow arrangement provided for in the merger agreement, regardless of when he signed the joinder agreement. Mr. Earley spoke about damages. He spoke about acquisition shares and escrow shares and how people who signed the joinder agreement received acquisition shares immediately. The remainder of their shares were placed in escrow. The proportion of quote-unquote acquisition shares compared to escrow shares is so vastly different that the receipt of acquisition shares upon signing the joinder agreement really doesn't alter the analysis here. The vast majority of the consideration was placed into escrow. And it was placed in an escrow that was highly illiquid, and it was the illiquidity of that escrow that caused plaintiff's damages. Mr. Earley spoke about how the motion to amend, or leave to amend, was filed post-judgment. If I recall correctly, the judgment in this case was filed the day after the decision on the motion to dismiss was issued, and so plaintiff did not have sufficient time to make a motion between the issuance of the decision on the motion to dismiss and the issuance of judgment. Mr. Earley raised a point that I do not believe was raised in the briefing about Delaware LLC law. To my recollection, I disagree with the way Mr. Earley characterized Delaware LLC law. I believe that it is also not permissible under Delaware LLC law to waive the duty of loyalty. However, having this issue arise right now in oral argument, I have not had a chance to review case law to provide to you on that. And then lastly, your honors, to talk about Mr. Phoenix. As is alleged in the amended complaint, Mr. Phoenix was involved in this campaign by Mr. Bernstein to coerce Mr. Keynes to sign the joint agreement beginning in or around October and continuing all the way through December. In fact, it was Mr. Phoenix who organized the phone call between Mr. Bernstein and Mr. Keynes in December that ultimately led to this email in which Mr. Bernstein misrepresented the facts. And unless your honors have any further questions, I will rely on our papers. Thank you. Thank you very much. Thank you, both sides, for your arguments. The court will reserve decision.